## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | |
|---|---|
| CITY OF HAMMOND, INDIANA, and ) <br> CITY OF WHITING, INDIANA, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ASARCO MASTER, INC., ) <br> ) <br> Defendant. ) | Case No.: _____ |

## PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs City of Hammond, Indiana, and City of Whiting, Indiana, by counsel, for their complaint against defendant ASARCO Master, Inc., allege and state:

### THE PARTIES

1. Hammond is a municipality organized under the laws of the State of Indiana located in Lake County, Indiana.

2. Whiting is a municipality organized under the laws of the State of Indiana located in Lake County, Indiana.

3. ASARCO Master is a corporation organized under the laws of Delaware having its principal place of business in Sahuarita, Pima County, Arizona.

### JURISDICTION AND VENUE

4. This Court has personal jurisdiction over the parties because the parties conducted business in Indiana and the actions giving rise to this complaint took place in Indiana and caused harm to Hammond and Whiting.

5. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367; 42 U.S.C. § 9613(b); and 42 U.S.C. § 6972(a). The Court has subject-matter

jurisdiction over the state-law claim because it arises from the same common nucleus of operative facts as the federal-law claims.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2); 42 U.S.C. § 9613(b); and 42 U.S.C. § 6972(a).

## NATURE OF THE CASE

7. This lawsuit asserts claims under Indiana's Environmental Legal Action Statute, Indiana Code §§ 13-30-9-1 *et seq.* (the "ELA"), and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607(a)(4)(B) *et seq.* ("CERCLA"), for costs incurred and to be incurred by Hammond and Whiting in responding to the release of hazardous substances which pose a risk to human health and the environment, and the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C.A. § 6972(a)(1)(B) ("RCRA"), for injunctive relief with regard to the imminent and substantial endangerment to health and the environment resulting from the disposal and release of solid and hazardous waste.

## SITE OPERATIONS

8. In 1932, American Smelting and Refining Company ("ASARCO") purchased the Federated Metals Corporation.

9. Federated Metals then became a wholly-owned subsidiary of ASARCO.

10. On June 1, 1937, Federated Metals began operating a 36-acre non-ferrous smelting, refining, recovery, and recycling facility at 2230 Indianapolis Boulevard, Hammond, Lake County, Indiana (the "Facility").

11. The operations included smelting, in the form of extractive metallurgy, and refining, in the form of purification of non-ferrous metals.

12. Federated Metals' smelting, refining, recovery, and recycling operations at the Facility released heavy metals, including lead, from the Facility's smoke stack, baghouse, and waste piles.

13. By 1939, the Facility employed hundreds of workers producing non-ferrous metals, most notably lead.

14. The lead generated at the Facility was used in the automotive, housing, and oil-drilling industries.

15. The operations of Federated Metals resulted in the disposal at the Facility of hazardous substances, such as lead, and the release of hazardous substances, such as lead, into the air around Hammond and Whiting.

16. For example, in the spring of 1939, local residents reported that releases from the Facility were so harmful that the health issues they caused forced students to miss school.

17. In April 1939, hundreds of residents complained to the Hammond City Council that "discharges from the [Facility] damaged roofs of residences, caused coughing and sneezing . . . and made it virtually impossible to open doors or windows of homes in the neighborhood."

18. In October 1939, Robert Prior, a health inspector for Hammond, testified in state court that Federated Metals "continued to operate and discharge gasses on the Whiting-Robertsdale community after repeated warnings to abate the alleged nuisance."

19. In October 1941, Whiting Councilman Stanley Shebish stated, in reference to the Facility, that "[w]hen the people of this community suffer bad health and many can't go to sleep at night because of this smoke and particles of waste, it is time to stop an underhanded thing like this!"

20. Throughout the 1940s, Federated Metals continued to release harmful hazardous substances into the environment.

21. Whiting's St. Adalbert's Church was compelled to file a complaint during this period due to the toxic releases from the Facility, citing the detrimental effects on the health of students, teachers, and parishioners.

22. As the 1940s continued, Federated Metals continued to expand its production at the Facility, leading to an increase in its pollution.

23. By the year 1946, Federated Metals provided employment to 350 workers at the Facility.

24. Federated Metals finished its expansion of the Facility by 1952.

25. In 1969, Carl Weigand, who was serving as the acting chief of air pollution control for Hammond, noted that the Facility had a significant odor issue, stating that the Facility "has a hell of [a] stink problem."

26. The contamination from the Facility continued to be an issue into the 1970s.

27. For instance, on August 13, 1970, a local Munster newspaper, *The Times*, included the following picture showing the yellowish white haze released by Federated Metals from the Facility into Whiting and Hammond.



Noon-Day Sky

Noon-day sky at Federated Metals in Whiting takes on a yellowish white hue as industrial fog envelopes surrounding area for blocks. Factory is located at New York Avenue and Indianapolis Boulevard.

28. The operations of Federated Metals carried on into the 1980s, accompanied by the generation of hazardous waste and releases of hazardous substances.

29. In 1980, Federated Metals disclosed that the Facility's operations included a copper-based alloy department with brass furnaces, copper and brass anode production, and cupola operations; a lead-based alloy operation with lead kettle refining and lead reverb dross smelting; a zinc alloy (also referred to as white metal) operation with zinc dust, kettle, and furnace operations; and nickel sulfide operations.

30. As part of its operations, Federated Metals managed a lead and tin fume bag house.

31. Federated Metals maintained its operations for three more years, until it halted its manufacturing activities at the Facility on February 18, 1983.

32. After ceasing operations, both Federated Metals and its parent company ASARCO confronted numerous environmental claims that strained their financial resources.

33. The repercussions of Federated Metals' operations at the Facility lingered, as the effects of those operations became the focus of state and federal action.

5

34. A November 17, 1992, *Consent Decree* between Federated Metals and the U.S. Environmental Protection Agency ("the U.S. EPA") disclosed that while Federated Metals operated the Facility, Federated Metals generated hazardous waste in the form of dust, including hazardous lead waste, also known as D008 waste, and emission control dust and sludge from secondary lead smelting, also known as K069 waste.

35. In 2005, ASARCO Master filed for Chapter 11 bankruptcy, and emerged from bankruptcy in 2009.

36. ASARCO Master's bankruptcy did not discharge the claims at issue in this complaint.

### ASARCO MASTER IS THE SUCCESSOR OF FEDERATED METALS

37. In 2005, Federated Metals was merged with and into ASARCO Master.

38. As a result of that merger, the liabilities of Federated Metals became ASARCO Master's liabilities.

39. ASARCO Master, therefore, is responsible for the contamination caused by Federated Metals.

### FEDERATED METALS' OPERATIONS CAUSED THE CONTAMINATION IN HAMMOND AND WHITING

40. The operations at Federated Metals' Facility included the storage of raw materials, reclamation of lead dross (impurities that floated on refined lead), foundry processes, white metal alloying, a large dust collector (baghouse), oil storage, and charcoal briquetting processes.

41. During the smelting process, a flux chemical cleaning agent was employed to eliminate impurities, leading to the formation of molten slag.

42. As a consequence of these operations and disposal activities, which included the disposal of lead waste and dust at and onto the Facility and the particulate generated from the lead solder alloying process, lead and arsenic were released from the Facility by Federated Metals.

43. Lead and arsenic have been identified in soil samples taken from Whiting and Hammond.

44. For example, soil testing by the U.S. EPA indicates that an important source of contamination in residential yards in Whiting and Hammond is air deposition of lead particles from the Facility.

45. According to the U.S. EPA, this is due to circumstances which include, but are not limited to, the fact that over time, Federated Metals' smelting operations at the Facility disposed of released lead particles and other heavy metal particles on nearby properties via releases to the air.

46. The U.S. EPA has stated that contamination in Whiting and Hammond was caused by Federated Metals.

47. For instance, the U.S. EPA's Hazard Ranking System Documentation dated March 27, 2023, indicates that over time, lead particles and other heavy metal particles released by the Facility contaminated the soil of residential (both single and multi-family) and non-residential (including businesses, churches, parks, play areas, and vacant lots) properties with elevated levels of lead and arsenic.

48. Lead-contaminated soil, exceeding regulatory standards, is present on residential and non-residential properties located along multiple streets in Hammond and Whiting.

49. Data collected by the U.S. EPA from soil particles confirms that these particles contained a mix of metals consistent with foundry slag, like the foundry slag generated by Federated Metals at the Facility.

**THE CONTAMINATION CONTINUES TO IMPACT HAMMOND AND WHITING**

50. The presence of a hazardous substance in the residential areas of Hammond and Whiting has been confirmed by the U.S. EPA, as well as local authorities in Hammond and Whiting.

51. Lead is designated as a hazardous substance under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14) and 40 C.F.R. 302.4.

52. The surface soil lead levels in Hammond and Whiting surpass the residential U.S. EPA Removal Management Levels ("RMLs").

53. In November/December 2016, the U.S. EPA Region 5 Superfund Removal Program initiated an extensive sampling strategy in public rights-of-way and vacant residential properties to determine the preliminary scope of a removal investigation.

54. The investigation carried out by the U.S. EPA identified lead contamination to the north and northeast of the Facility.

55. In March 2017, soil surface levels in the Robertsdale neighborhood of Hammond and Whiting showed lead content as high as 2,200 parts per million.

56. The U.S. EPA's sampling in June 2017 confirmed that the lead contamination in the Robertsdale neighborhood originated from the Facility.

57. In order to identify potential sources of lead found in residential yards, soil samples were taken from a landfill at the Facility in June 2017.

58. Analytical results from samples collected at the landfill and from residential properties were sent to a laboratory to determine whether the material in the landfill match the material found in residential yards.

59. The U.S. EPA concluded that the lead particles in the landfill soils match the material found in the residential soils.

60. The contamination released from and disposed of by Federated Metals at the Facility poses a risk to human health and the environment.

61. The affected residential area is densely populated, primarily with single-family homes, but also includes commercial buildings such as churches, schools, and daycares.

62. Exposure to lead can result in a variety of significant health problems.

63. According to the U.S. EPA, lead exposure through inhalation or ingestion can negatively impact nearly every organ and system in the human body.

64. Potential individuals at risk include residents, particularly children under six years old, and pregnant or nursing women.

65. Children face the highest risk from the toxic effects of lead.

66. Initially, lead travels in the blood to the soft tissues (heart, liver, kidney, brain, etc.).

67. Over time, the lead redistributes to the bones and teeth where it tends to remain.

68. Children exposed to high levels of lead have shown symptoms of developmental delays, damage to the brain and nervous system, slowed growth and development, learning and behavioral problems, hearing and speech problems, nerve damage, liver damage, colic, and anemia. In extreme cases, high levels of lead in children have led to death.

69. Impacts associated with significantly elevated blood lead levels include neurotoxic effects, such as irreversible brain damage.

70. The lead in Hammond and Whiting is present in the soil of residential properties where it can be released through means such as tracking, surface runoff, and wind dispersion.

71. Residential properties in Hammond and Whiting have soil contaminated with lead levels that exceed RMLs.

72. By participating in common residential activities, such as walking, gardening, or playing, residents of Hammond and Whiting can spread the high levels of lead into other areas, especially where the soil is exposed.

73. ASARCO Master's disposal and release of hazardous substances poses an imminent and substantial endangerment to health and the environment.

74. Since the discovery of the contamination, Hammond and Whiting have borne, and will continue to bear, environmental response costs to address the contamination, including expenses necessary to remove and remediate the contamination.

75. Through this action, Hammond and Whiting seek to recover their past and future environmental response costs, incurred as a result of ASARCO Master's contamination, attorneys' fees and court costs associated with this action, and injunctive relief to require ASARCO Master to address its disposal and release of solid and/or hazardous waste and hazardous substances.

76. ASARCO Master's release and disposal of hazardous substances from the Facility have caused irreparable harm to Hammond and Whiting, which will continue unless and until ASARCO Master is ordered by this Court to take all action as may be necessary to abate the imminent and substantial endangerment created by ASARCO Master's release and disposal of hazardous substances from the Facility in accordance with a plan submitted to and approved by this Court.

## CLAIMS FOR RELIEF

### Count I
### Indiana Environmental Legal Action

77. Hammond and Whiting incorporate by reference paragraphs 1 through 76 above as though fully set forth herein.

78. Section 13-30-9-2 of the ELA statute reads as follows:

> A person may, regardless of whether the person caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum.

79. Hammond, Whiting, and ASARCO Master are "persons" within the meaning of the ELA statute.

80. ASARCO Master caused and contributed to the release of hazardous substances into the subsurface soil and groundwater at and around Hammond and Whiting.

81. The subsurface soil and groundwater contamination at and around Hammond and Whiting poses a risk to human health and the environment.

82. Through the work conducted at and around Hammond and Whiting by and on behalf of Hammond and Whiting, they have incurred and will continue to incur environmental response costs associated with ASARCO Master's contamination of Hammond and Whiting.

83. ASARCO Master is liable to Hammond and Whiting for all costs Hammond and Whiting have incurred and will incur as a result of the subsurface soil and groundwater contamination at and around Hammond and Whiting, as well as the attorneys' fees and court costs incurred by Hammond and Whiting in bringing this action.

## Count II
## Comprehensive Environmental Response, Compensation, and Liability Act

84. Hammond and Whiting incorporate by reference paragraphs 1 through 83 above as though fully set forth herein.

85. 42 U.S.C. § 9607(a)(4)(B), commonly referred to as CERCLA Section 107, reads as follows:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section-
>
> (1)  the owner and operator of a vessel or a facility,
>
> (2)  any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3)  any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other part or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4)  any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for-
>
> (A)  all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
>
> (B)  any other necessary costs of response incurred by any other person consistent with the national contingency plan (…)

86. 42 U.S.C. § 9601(9) reads as follows: "The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline … or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."

87. 40 CFR § 304.12 (m) reads as follows: "Potentially responsible party or PRP means any person who may be liable pursuant to section 107(a) of CERCLA, 42 U.S.C. 9607(a), for response costs incurred and to be incurred … not inconsistent with NCP."

88. The Facility is a facility pursuant to 42 U.S.C. § 9601(9).

89. ASARCO Master owned and operated the Facility at a time when lead—a hazardous substance—was disposed of at the Facility.

90. ASARCO Master released and disposed of hazardous substances into the subsurface soil and groundwater in Hammond and Whiting through its release and disposal of lead waste and lead dust—a hazardous substance—from the Facility and, therefore, is a Potentially Responsible Party as defined in 40 CFR § 304.12(m).

91. ASARCO Master's release from the Facility has caused Hammond and Whiting to incur, and Hammond and Whiting will continue to incur, response costs that are necessary and consistent with the National Contingency Plan.

92. For instance, Hammond and Whiting are in the process of abating the imminent and substantial endangerment created by ASARCO Master's release and disposal of hazardous substances from the Facility. Hammond and Whiting have incurred costs that include the removal of lead from over 80 residential homes, though much more work remains necessary.

93. ASARCO Master is jointly and severally liable to Hammond and Whiting for all costs Hammond and Whiting have incurred and will incur as a result of the subsurface soil and groundwater contamination at and around Hammond and Whiting.

## Count III
## Resource Conservation and Recovery Act

94. Hammond and Whiting incorporate by reference paragraphs 1 through 93 above as though fully set forth herein.

95. 42 U.S.C. § 6972 (a)(1)(B), commonly referred to as Section 7002 of RCRA, states that any person may commence a civil action on his own behalf or:

> [A]gainst any person … and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

96. The Facility was a treatment, storage, and disposal facility under RCRA.

97. ASARCO Master is a past generator, owner, and operator of the treatment, storage, or disposal facility at the Facility.

98. During ASARCO Master's generation, ownership, and operations at the Facility, ASARCO Master handled, stored, treated, transported, and disposed of hazardous and solid waste.

99. ASARCO Master's past handling, storage, treatment, transportation, and disposal of solid and hazardous waste presents an imminent and substantial endangerment to health or the environment.

100. Hammond and Whiting have been injured as a direct and proximate result of ASARCO Master's conduct by the contamination of Hammond and Whiting by ASARCO Master's disposal of lead waste and lead dust.

101. This lawsuit is not precluded by governmental action. Specifically, neither the U.S. EPA nor the State of Indiana has commenced, nor is diligently prosecuting, an action to abate the endangerment at issue in this lawsuit. Further, neither the U.S. EPA nor the State of Indiana is actually engaged in a removal action, under authority of 42 U.S.C. § 9604, to abate the endangerment at issue. In addition, neither the U.S. EPA nor the State of Indiana is diligently proceeding with a remedial action under 42 U.S.C. § 9601, *et seq.*, to abate the endangerment at issue. Finally, no responsible party is diligently conducting a removal action, remedial

investigation and feasibility study, or proceeding with a remedial action pursuant to a judicial or administrative order obtained or issued under 42 U.S.C. § 9606, or 42 U.S.C. § 6973, to abate the endangerment at issue.

102. On December 5, 2023, Hammond and Whiting served ASARCO Master with a Notice of Intent to File Suit under RCRA pursuant to 42 U.S.C. § 6972(b) and 40 C.F.R. § 254.2(a)(1) by registered mail, return receipt requested, addressed to ASARCO Master. This document provided notice of endangerment at issue in this lawsuit. A copy of the Notice of Intent to File Suit under RCRA served on defendant is attached as Exhibit A and incorporated by reference.

103. Copies of such Notice of Intent to File Suit under RCRA were mailed on December 5, 2023 to the United States Attorney General, the Administrator of the U.S. EPA, the Regional Administrator of the U.S. EPA for Region Five, and Brian C. Rockensuess, Commissioner of the Indiana Department of Environmental Management. True and correct copies of the registered mail receipts showing receipt of the Notice of Intent to File Suit by EPA, the State, and ASARCO Master are attached as Exhibit B and incorporated by reference.

**Prayer for Relief**

WHEREFORE, Hammond and Whiting respectfully request that the Court:

a. Enter judgment in favor of Hammond and Whiting, and against ASARCO Master;

b. Order ASARCO Master to pay Hammond and Whiting an amount that will fully and fairly compensate Hammond and Whiting for their past and prospective damages;

c. Order ASARCO Master to pay Hammond and Whiting all response costs incurred and to be incurred by Hammond and Whiting addressing the release and disposal

of the hazardous substance contamination from the Facility that are necessary and consistent with the National Contingency Plan;

d. Order ASARCO Master to pay Hammond and Whiting for their reasonable attorneys' fees and court costs incurred in bringing this action;

e. Declare that ASARCO Master is obligated to pay all costs, damages, fees, and other expenses incurred and to be incurred by Hammond and Whiting arising from the environmental contamination at Hammond and Whiting;

f. Declare that ASARCO Master is obligated to pay all response costs incurred and to be incurred by Hammond and Whiting addressing the release and disposal of the hazardous substance contamination from the Facility that are necessary and consistent with the National Contingency Plan ;

g. Order ASARCO Master to remove all solid and hazardous waste, remediate, and take other action as may be necessary to abate the imminent and substantial endangerment in accordance with a plan submitted to and approved by this Court;

h. Order ASARCO Master to pay all costs of litigation, including reasonable attorney's and expert witness' fees, as authorized by 42 U.S.C. § 6972(e);

i. Award Hammond and Whiting all further relief that is just and proper including prejudgment interest at Indiana's statutory rate of eight percent on all covered, but unreimbursed, past costs.

Respectfully submitted,

*[s] David L. Guevara*
David L. Guevara, Atty. No. 26388-49
John F. Huldin, Atty. No. 35258-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500

          Indianapolis, Indiana 46204-2023
          Telephone: (317) 713-3500
          Email:  dguevara@taftlaw.com
            jhuldin@taftlaw.com

          *Counsel for Plaintiffs*

128635296