UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| CITY OF HAMMOND, INDIANA, and CITY OF WHITING, INDIANA, ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Cause No. 2:24-CV-96-PPS-JEM |
| ASARCO MASTER, INC., ) ) | |
| Defendant. ) | |

## OPINION AND ORDER

According to the complaint in this case, the Cities of Hammond and Whiting have an environmental calamity on their hands arising out of the operation of a smelting facility which began polluting their cities *nine* decades ago. They're trying to hold defendant ASARCO Master to account. ASARCO says the Cities' environmental claims relating to the operation of the smelting facility were resolved during a bankruptcy it filed in Texas twenty years ago and the complaint should therefore be tossed under Rule 12(b)(6). [DE 19]. For the reasons detailed below, I agree with ASARCO.

### Background

Hammond and Whiting allege past and future environmental response costs related to a release of hazardous substances originating from a smelting facility which used to operate in Hammond decades ago. From June 1937 to February 1983, Federated Metals Corporation operated a thirty-six-acre non-ferrous smelting, refining, recovery,

and recycling facility in Hammond. [DE 1, ¶¶ 10, 31, 37–39]. Federated Metals is a wholly owned subsidiary of American Smelting and Refining Company ("ASARCO") which purchased Federal Metals in 1932. [DE 1, ¶¶ 8, 9]. The operations of the Hammond site over the course of some forty years resulted in the disposal of waste byproducts and the release of hazardous substances into the air around Hammond and Whiting. *Id.*, ¶¶ 11–31. More specifically, the facility's operations allegedly caused a widespread release of lead into the soil in the Robertsdale neighborhood in Hammond and Whiting. *See id.* Despite EPA testing, the extent of this contamination is, as of yet, unknown. *Id.*, ¶¶ 52–61.

Federated Metals closed the facility in February 1983. [DE 1, ¶ 31]. After shutting down its Hammond operations, Federated Metals and its parent company, ASARCO, faced a number of environmental claims that placed a significant strain on the company's financial resources. *Id.*, ¶¶ 32–33. In 1992, Federated Metals entered a consent decree with the EPA, in which it disclosed that it generated hazardous waste at the facility in the form of toxic dust and waste both of which were byproducts of lead smelting activities. *Id.*, ¶ 34. In 2005, ASARCO Master, Inc. merged with Federated Metals and, as a result, assumed Federated Metals' liabilities, including any responsibility for contamination caused at the Hammond facility. *Id.*, ¶¶ 37–39.

Based on Federated Metals' historical polluting activities in the area, the Cities of Hammond and Whiting, bring claims against ASARCO Master under Indiana's Environmental Legal Action Statute ("ELA"), and federal environmental laws—

2

specifically, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") and the Resource Conservation and Recovery Act ("RCRA"). Noting that soil samples from 2016 and 2017 have confirmed lead contamination in their communities, Plaintiffs seek to hold ASARCO liable for any costs the communities have and will incur as a result of the contamination, in addition to attorneys' fees and costs incurred in bringing this action. [DE 1 at 15–16]. Plaintiffs also seek injunctive relief directing ASARCO to "remove all solid and hazardous waste" and otherwise "remediate" the pollution in Hammond and Whiting "in accordance with a plan submitted to and approved by this Court." *Id.* at 16.

Not so fast says ASARCO who claims their liability, if any, was extinguished in bankruptcy a decade and a half ago. The Cities acknowledge that in 2005 (presumably following its merger with Federated Metals), ASARCO Master filed a Chapter 11 bankruptcy. [DE 1, ¶ 35]. The company remained in Chapter 11 for four years, emerging in 2009. *Id.* Meeting that defense head on, the complaint blithely asserts that "ASARCO Master's bankruptcy did not discharge the claims" at issue in this action. *Id.*, ¶ 36.

ASARCO Master flatly disagrees with this assessment. It has filed a motion to dismiss the action [DE 19], arguing that its "landmark bankruptcy settlement" resolved the cities' environmental claims. [DE 25 at 1; *see* DE 20 at 10]. In support of this argument, ASARCO Master directs my attention to several matters of public record from its Texas bankruptcy case. [DE 20-1 (Amended Consent Decree); DE 20-2 (Consent Decree Order); DE 20-3 (Order of Confirmation); DE 20-4 (Confirmed Plan of

3

Reorganization)]. The Cities note that ASARCO Master's motion relies on evidence extraneous to the pleadings and suggests that this "violates basic procedural rules and warrants outright dismissal of the motion," or, in the alternative, "it would necessitate full discovery due to the complex factual issues at play, effectively transforming this into a summary judgment motion." [DE 24 at 1].

This argument is entirely misplaced. It is well established that documents of this type—court records, agency decisions, administrative body reports, and even government websites—are appropriate subjects of judicial notice. *See e.g. Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008); *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991); *Adams v. Atl. Richfield Co.*, 2023 WL 6381346, at *4 (N.D. Ind. Sept. 29, 2023). Therefore, when considering the plausibility of the Cities' complaint, I will take judicial notice of the fact that the "documents exist, they say what they say, and they have had legal consequences." *Our Country Home Enters. v. Comm'r of Internal Revenue*, 855 F.3d 773, 782 n.1 (7th Cir. 2017).

On August 9, 2005, ASARCO LLC filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code. *See generally In re ASARCO LLC*, Cause No. 05-21207 (Bankr. S.D. Tex. Aug. 9, 2005). In October of that year, ASARCO Master also filed a voluntary petition for relief in the same bankruptcy court. *See generally In re ASARCO Master Inc.*, Cause No. 05-21883 (Bankr. S.D. Tex. Oct. 13, 2005). The bankruptcy court entered an order providing for procedural consolidation and joint administration of

4

these two related bankruptcies, organizing the matters under the bankruptcy case of the lead debtor, ASARCO LLC.

Four years later, in March 2009, ASARCO, the EPA, and several states—including Indiana—entered an Amended Consent Decree, which established a custodial trust for certain owned sites in eleven states. [DE 20-1]. Under this agreement, ASARCO agreed to pay over $70 million to a newly created entity, the ASARCO Multi-State Custodial Trust, provided the bankruptcy court approved the consent decree and confirmed a bankruptcy organization plan. Paragraph 10(e)(xi) of the Amended Consent Decree provides:

> e. In **settlement and full satisfaction of all claims against Debtors related to the Designated Properties and the Sites** … Debtors shall make a payment of $10,400,000 for the Custodial Trust Administrative Account and contributions and accretions totaling $60,555,493… to be allocated as follows:
>
> [. . .]
>
> (xi) **payment of $1.2 million** on the Effective Date **to fund future Environmental Actions and certain future oversight costs of the Governments with respect to the Whiting Site in Lake County, Indiana**, to be deposited in the Custodial Trust Environmental Cost Account for that site.

*Id.* at 17-18, 20 (emphasis added). The "Whiting Site" is defined to include "the Whiting Designated Property, any further description in the proofs of claim, and any location at which hazardous substances from this property have come to be located" (which would seem to cover surrounding neighborhoods, like the Robertsdale community in Hammond and Whiting). *Id.* at 72. Three months later, on June 5, 2009, the bankruptcy

5

court entered an order and judgment (the "Consent Decree Order"), which provided that the ASARCO Multi-State Custodial Trust "shall receive a settlement payment totaling $70,955,493 . . . [to] be paid in cash, in full" on the effective date of ASARCO's bankruptcy reorganization plan. [DE 20-2 at 2].

In November 2009, a district judge in the Southern District of Texas entered an order confirming the plan. [DE 20-3]. *See* DE 79, *In re ASARCO LLC*, Cause No. 2:09-CV-177 (S.D. Tex. Nov. 13, 2009). This order confirmed "ASARCO Incorporated and Americas Mining Corporation's Seventh Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, as Modified on August 20, 2009, August 23, 2009, and August 27, 2009." That's a mouthful, so I'll refer to it as the "Confirmed Plan of Reorganization," for short. [DE 20-4]. *See* DE 12728, *in re ASARCO LLC*, Cause No. 05-21207 (Bankr. S.D. Tex. Aug. 30, 2009).

The district court's Order of Confirmation, in Paragraph XII.5, stated that the terms of the order and Confirmed Plan of Reorganization were binding on all parties with legal claims against ASARCO:

> [O]n the Effective Date, the provisions of the Parent's Plan and this Confirmation Order (the "order"), **shall bind . . . all holders of Claims and Demands (whether known or unknown) against and Interests in the Debtors**, including such holders, heirs, successors, assigns, trustees, executors, administrators, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, or guardians, **whether or not the Claims, Demands, or Interests of these entities are impaired under the Parent's Plan, whether or not these entities have voted to accept or reject the Parent's Plan, and whether or not these entities have filed Proofs of Claim in the Reorganization Cases.**

6

[DE 20-3 at 73 (emphasis added)].

The Order of Confirmation then lays out three key provisions bearing on the scope of liabilities to be discharged and released as part of ASARCO's bankruptcy. Paragraph XII.M.81 of the order provides for full satisfaction, discharge, and release of claims against ASARCO in the relevant states (including Indiana):

> Except as otherwise expressly provided in this order or the Parent's Plan, **the rights afforded in the Parent's Plan and the treatment of all Claims, Demands, and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, Demands, and Interests of any nature whatsoever, against any Debtor or its Estate, assets, properties, or interests in property**. Except as otherwise provided herein, all Claims and Demands against and Interests in the Debtors are hereby **satisfied, discharged, and released in full . . . .**

*Id.* at 96–97 (emphasis added).[1] Paragraph XII.M.89. of the order goes on to state:

> Except as otherwise provided in the Parent's Plan or this order, this order shall as of the Effective Date . . . **preclude all Persons from asserting against the Debtors, Reorganized ASARCO, or any of their Assets any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date**, all pursuant to §§ 524 and 1141 of the Bankruptcy Code. This discharge shall void any judgment obtained against any of the Debtors at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest.

---

[1] To avoid all doubt, the next provision, Paragraph XII.M.82, specifically states: "[T]he discharge and release set forth in the previous paragraphs shall also operate as an injunction permanently prohibiting and enjoining the commencement or continuation of any action or the employment of process with respect to, or any act to collect, recover from, or offset (a) any Claim or Demand discharged and released in the previous paragraph, and (b) any cause of action, whether known or unknown, based on the same subject matter as any Claim or Demand discharged and released in the previous paragraph." [DE 20-3 at 97].

*Id.* at 102 (emphasis added). This language, in tandem with Paragraph XII.5., makes clear that any claims arising from ASARCO's pre-bankruptcy conduct (*i.e.*, prior to the "Effective Date") are subject to discharge.

Finally, the Order of Confirmation permanently enjoined actions to obtain discharged, released, and precluded claims under the foregoing provisions:

> Except as otherwise expressly provided in the Parent's Plan or this order, **all entities that have held, currently hold, or may hold Claims or other debts or liabilities against the Debtors . . . are permanently enjoined**, on and after the Effective Date, **from taking any of the following actions** on account of any such Claims, debts, liabilities, Interests, or rights: . . . **commencing or continuing any action in any manner or in any place that does not comply with or is inconsistent with the provisions of the Parent's Plan or this order. . . . Any entity injured by a willful violation of such injunction may recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages from the willful violator.**

*Id.* at 103 (Paragraph XII.M.90) (emphasis added).

Based on the foregoing, ASARCO Master argues that the Cities' claims were plainly discharged as part of its bankruptcy. [*See* DE 20-3; DE 20-4]. In so arguing, ASARCO Master notes a handful of matters in which this district has granted motions to dismiss in similar circumstances—*i.e.* where the underlying claims had been satisfied, discharged, released, precluded, or enjoined. [*See* DE 20 at 12–13; DE 25 at 5]. ASARCO Master also cites to various cases where plaintiffs voluntarily dismissed their actions or did not contest dismissal upon learning of the Texas court orders. [DE 35 at 3 n.2].

The Cities have three responses: (1) they did not receive constitutionally effective notice of ASARCO's bankruptcy case; (2) their RCRA claim—because it is equitable in

nature—is not subject to discharge in bankruptcy; and (3) their claims allegedly arose after ASARCO's bankruptcy case. [DE 24 at 10–16].

## Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), a claim for relief must be "plausible on its face." *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires the plaintiff to plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint riddled with conjecture just won't do. *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

## Discussion

ASARCO Master (which I'll just call ASARCO from this point on) has put forth two primary arguments for why the Cities' complaint should be dismissed. First, ASARCO argues this case should be dismissed because the complaint fails to allege sufficient facts to state a plausible claim for relief. [DE 20 at 13]. And second, dismissal is required because the Texas district court's confirmation order "satisfied, discharged,

released, and precluded" the Cities' claims. [DE 20 at 10]. I consider each of ASARCO's arguments below.

## I.    Does the Complaint Allege a Plausible Claim for Relief?

ASARCO argues the complaint does not state a claim because it "fails to do more than make conclusory legal allegations without well-pleaded facts supporting those claims." [DE 20 at 13]. This argument does not hold water. To survive a motion to dismiss, Plaintiffs need only include a "short and plain statement" of a claim that is plausible and shows that the plaintiffs are entitled to relief. Fed. R. Civ. P. 8(a)(2); *Kokenis v. Kurywczak*, 2023 WL 2207631, at *3 (7th Cir. 2023) ("People in federal court do not need to plead elements or facts, but they do need to present a story that holds together in a way that gives adequate notice to the defendants."). This is not a high bar. *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570-71 (7th Cir. 2023). Hammond and Whiting have alleged facts sufficient to support each of their claims.

The complaint asserts three claims against ASARCO: Count I is brought under Indiana's Environmental Legal Action Statute ("ELA"); Count II is pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"); and Count III is brought under the Resource Conservation and Recovery Act ("RCRA"). [DE 1 at 11-13]. The allegations contained in Plaintiffs' complaint easily clear the low bar of providing a short and plain statement of each claim and the grounds upon which the claims rest.

10

To sufficiently plead a CERCLA claim, Plaintiffs must allege (1) the site is a "facility" as defined by CERCLA; (2) the defendant is a "responsible person" as defined by CERCLA; (3) there was a release of hazardous substances; and (4) such release caused the plaintiff to incur response costs. *Cont'l Paper Grading Co. v. Nat'l R.R. Passenger Corp. - Amtrak*, 2021 WL 5299772, at *1 (N.D. Ill. Nov. 15, 2021) (citing *Env't Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992)). Hammond and Whiting have successfully pleaded a CERCLA claim here. They allege that (1) the site at issue in this lawsuit is a "facility" as defined by CERCLA; (2) ASARCO (through Federated Metals) owned and operated the facility and is a responsible party as defined by CERCLA; (3) ASARCO (again, through Federated Metals) released and disposed of hazardous substances into the subsurface soil and groundwater in Hammond and Whiting and is a responsible party; and (4) they have incurred costs associated with the removal. [DE 1 at 12-13]. This is all Plaintiffs need to allege to state a plausible CERCLA claim.

The Cities have also successfully pleaded a claim for relief under Indiana's ELA statute. Section 13-30-90-2 of the ELA states:

> A person may, regardless of whether the person caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum.

Ind. Code Ann. § 13-30-9-2.

11

The Cities allege that ASARCO is a person within the meaning of the statute, that ASARCO has caused or contributed to the release of hazardous substances into the subsurface soil and groundwater in Hammond and Whiting, that the contamination poses a risk to human health and the environment, and that Hamond and Whiting have incurred and will continue to incur response costs associated with the contamination. [DE 1 at 11].

Finally, the Cities have successfully pleaded a RCRA claim under 42 U.S.C. §6972, which is commonly referred to as Section 7002 of the statute. This section of the act states any person may commence a civil action on his own behalf:

> against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment;

42 U.S.C. § 6972 (a)(1)(B).

To state a claim under the operative RCRA provision, a plaintiff must allege: (1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or

hazardous waste may present an imminent and substantial endangerment to health or the environment. *See e.g.*, *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 292 (5th Cir. 2001). Plaintiffs allege that ASARCO owned and operated a treatment, storage, and disposal facility under RCRA, and that during ASARCO's operation of the facility ASARCO handled solid hazardous waste material that presents an imminent and substantial endangerment to health or the environment.[2] [DE 1 at 13-15].

Plaintiffs have made a short and plain statement of the claims showing they are entitled to relief and that is all that is required to allege a cause of action in federal court. *See e.g.*, *Stuhlmacher v. Home Depot U.S.A., Inc.*, 2011 WL 1792853, at *2 (N.D. Ind. May 11, 2011) (explaining that it is rudimentary that pleading requirements in federal courts are governed by the federal rules and federal courts may not impose heightened pleading requirements).

Because we've established the Cities have sufficiently met the federal pleading standard for each of their claims, I'll next turn to the more difficult question of whether these claims are precluded by ASARCO's bankruptcy proceedings, consent decree, and related court orders in the Southern District of Texas.

---

[2] Plaintiffs have also complied with the notice and 90-day delay requirement of 42 U.S.C. §6972(b)(2)(A). [*See* DE 1 at ¶¶ 102-103].

13

II.    ASARCO's Bankruptcy and the Cities' Claims

A.  Notice of the Bankruptcy

ASARCO argues that the Cities' claims must be dismissed because "any claim Plaintiffs may have had was resolved in ASARCO's landmark bankruptcy case." [DE 20 at 10]. Of course, for ASARCO's bankruptcy to preclude the claims, the Cities must have been afforded constitutionally sufficient notice of the bankruptcy. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Smith*, 582 F.3d 767, 779 (7th Cir. 2009). ASARCO argues that because the Cities were "unknown" creditors, they were entitled only to publication notice of the bankruptcy. [DE 25 at 8]. As explained by the Seventh Circuit, the issue is not whether the creditor is known but whether the creditor's name and address can be readily ascertained. *Fogel v. Zell*, 221 F.3d 955, 963 (7th Cir. 2000). If a creditor is "reasonably ascertainable" the creditor is entitled to actual notice, but if the creditor is not reasonably ascertainable the creditor is only entitled to constructive notice. *In re USA Gymnastics*, 40 F.4th 775, 777 (7th Cir. 2022). A creditor qualifies as "reasonably ascertainable" if the debtor could uncover the creditor's claim and identity using "reasonably diligent efforts." *Id.* at 778.

The Cities of Hammond and Whiting are the entities suing for the environmental response costs to remedy the contamination in the Robertsdale neighborhood. The

14

Cities are bringing this action both on their own behalf and on behalf of their residents. [DE 36 at 18]. Because the individuals living on contaminated land in Hammond and Whiting are numerous and unknown, notice by publication was appropriate here. *Fogel*, 221 F.3d at 963 (explaining that notice by publication may be entirely appropriate when potential claimants are numerous, unknown, or have small claims). During the bankruptcy proceedings, ASARCO filed an affidavit listing the numerous publications in which a notice of the bankruptcy and last day to file was included. These publications included nationwide publications such as the Wall Street Journal and USA Today. *See* DE 2375, *In re: ASARCO LLC*, Case No. 05-21207, (Bankr. S.D. Tex. June 22, 2006) ("Affidavit by The Trumbull Group, LLC Regarding Publication of the Notice of Last Day to File General Claims and Asbestos-Related Claims"). ASARCO's widespread announcement of the bankruptcy and bar date provided sufficient notice. *See e.g.,* *Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc.*, 271 F.R.D. 139, 145 (N.D. Ill. 2010) ("When individual notice is infeasible, notice by publication in a newspaper of national circulation ... is an acceptable substitute.)."

ASARCO also published notice of the public comment process related to the bankruptcy consent decree in the Federal Register. [DE 25 at 8-9]; 74 Fed. Reg. 12379 ("Notice of Lodging of Proposed Settlement Agreement Under the Comprehensive Environmental Response, Compensation and Liability Act."). Publication in the federal register adequately provides notice to non-parties. *See e.g., City of Waukegan, Ill. v. Nat'l Gypsum Co.*, 2009 WL 674347, at *3 (N.D. Ill. Mar. 12, 2009) (publication in the Federal

Register is sufficient to protect the rights of non-parties to a CERCLA consent decree);

*United States v. Bayer Healthcare, LLC.*, 2007 WL 4224238, at *4 (N.D. Ind. Nov. 28, 2007)

(finding a consent decree and its formation "procedurally fair" where notice of the

proposed consent decree was published in the Federal Register); *Bennett v. Dir., Off. of*

*Workers' Comp. Programs, U.S. Dep't of Lab.*, 717 F.2d 1167, 1169 (7th Cir. 1983)

(explaining that it has long been established that publications in the Federal Register

have the legal effect of constructive notice of their contents to all who are affected

thereby).

The Cities argue that it is unreasonable to expect them to "casually peruse the

Federal Register to learn that their rights might be affected." [DE 36 at 8]. But simply

put, that's the way publication by notice in the Federal Register works. *Fed. Crop Ins.*

*Corp. v. Merrill*, 332 U.S. 380, 384–85 (1947) ("Just as everyone is charged with

knowledge of the United States Statutes at Large, Congress has provided that the

appearance of rules and regulations in the Federal Register gives legal notice of their

contents."). Thus, to the extent Hammond and Whiting bring this lawsuit on behalf of

their residents, they were provided sufficient notice of the bankruptcy and consent

decree.

The Cities argue that apart from its residents, they should have received notice.

"[T]he Cities own parcels of land within the lead plume, giving them direct standing

under CERCLA, the IELA, and RCRA". [DE 36 at 18]. As explained by ASARCO, the

State of Indiana is a party to the bankruptcy consent decree and the consent decree was

16

signed by Indiana's Attorney General's office. [*See* DE 20-1]. To the extent any additional or separate notice was required solely for the Cities' interests, the notice to the State should be imputed to the Cities. *Capdevila v. Sheahan*, 1995 WL 399690, at *3 (N.D. Ill. July 6, 1995) (explaining that constructive notice applies when actual notice is provided to a party who shares an identity of interest with the proper party). Indiana is a party to the bankruptcy consent decree and the Cities are simply offshoots of the State of Indiana. *Cnty. Dep't of Pub. Welfare of Lake Cnty. v. Stanton*, 545 F. Supp. 239, 243 (N.D. Ind. 1982) ("[A] municipality or any other unit of local government is a creature of the state and receives all its power from the state."); *Hemphill v. Wabash R. Co.*, 209 F.2d 768, 769 (7th Cir. 1954) ("Cities and villages are corporate entities existing under and by virtue of state law and, therefore, are possessed of no inherent power independent of statute.").

The interests of the Cities in this suit and the interests of the State of Indiana when it appeared as a creditor in ASARCO's bankruptcy proceedings are completely aligned. Both the Cities and Indiana seek payment for cleanup of the environmental contamination resulting from the smelting activities at the Whiting Site. And speaking more pragmatically, I am dubious of the idea that the State of Indiana and its Attorney General signed the consent decree without informing the local municipalities where the Whiting Site is located. In this instance, Hammond and Whiting had sufficient notice of the bankruptcy.

17

Because the Cities had sufficient notice of the bankruptcy, I will next consider whether the bankruptcy, consent decree, and related court orders discharge or preclude the claims Hammond and Whiting have presented in this suit.

**B. The CERCLA and ELA Claims Were Properly Discharged in Bankruptcy**

Let's start with Plaintiffs' CERCLA and ELA claims as all parties acknowledge that these are claims which can be discharged during bankruptcy. The Seventh Circuit has established a test to determine when a party has a CERCLA claim so that failure to raise the claim during the bankruptcy proceeding bars a suit against the debtor. "In the Seventh Circuit, a creditor has a contingent CERCLA claim for purposes of bankruptcy when the potential claimant 'can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs.'" *Ninth Ave. Remedial Grp. v. Allis-Chalmers Corp.*, 195 B.R. 716, 734 (N.D. Ind. 1996) (quoting *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 974 F.2d 775, 786 (7th Cir. 1992)).

Plaintiffs argue that their "RCRA, CERCLA, and Indiana ELA causes of action arose years after ASARCO received the discharge from the bankruptcy court in December of 2009." [DE 24 at 12]. Plaintiffs say they "did not even become aware of the contamination in the Robertsdale neighborhood until 2016." [*Id.*] However, as admitted to in the complaint, all of Federated Metals' contamination took place before ASARCO entered bankruptcy in 2005. [*See* DE 1 at ¶ 31]. Moreover, there are numerous facts in

18

the Cities' complaint illustrating that they knew about the release of these hazardous materials and could tie the release to ASARCO prior to ASARCO's bankruptcy.

An examination of the facts demonstrating knowledge of contamination in analogous Seventh Circuit cases help to illustrate the Cities had enough information that they knew there was a release of a hazardous substance and could tie it to ASARCO prior to the confirmation of ASARCO's bankruptcy.

Consider first, *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 974 F.2d 775 (7th Cir. 1992) (Chicago I) where the Seventh Circuit held the Washington State Department of Transportation's (WSDOT) CERCLA claim was barred because the claim arose prior to the consummation of the bankruptcy and WSDOT did not file the claim with the bankruptcy court before the bankruptcy bar date. In *Chicago I*, a letter and a phone conversation informed WSDOT of the spill of an extremely hazardous substance resulting from a train derailment. *Id*. at 787. WSDOT also took soil samples of the contaminated area. *Id*. These events took place prior to the bankruptcy bar date and the court held that WSDOT's knowledge of the contamination gave rise to a CERCLA claim which was properly discharged in bankruptcy. The court noted "any other conclusion would frustrate the bankruptcy court's interest in having all claims before it, and any other conclusion would frustrate CERCLA's goal of providing a speedy cleanup of hazardous sites." *Id*.

In a similar case, *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 3 F.3d 200 (7th Cir. 1993) (Chicago II) the Seventh Circuit again considered the conflicting goals of

19

environmental cleanup and a fresh start for bankruptcy debtors. In *Chicago II*, the Seventh Circuit held that a CERCLA claim was barred because the claimant knew of the contamination prior to the confirmation of the bankruptcy. Indeed, the Court held that actual knowledge of the contamination is not required, and constructive knowledge of the contamination is sufficient to bar a CERCLA claim. The district court determined the CERCLA claimant had constructive knowledge of the contamination because the site was identified as one of the most contaminated places in the country, a Dames & Moore report discussing the contamination was readily available, and the EPA notified the claimant of potential contamination. *Id*. at 205. Affirming the district court, the Seventh Circuit held that the district court's finding of constructive knowledge was not "clearly erroneous" and that "[o]ur national environmental policy does not permit a commercial landowner in a tainted area to put on blinders or attempt an ostrich defense." *Id*. at 207.

While the facts of this case are not exactly the same as the "*Chicago*" cases discussed above, the facts before me do show that Hammond and Whiting had at least constructive knowledge of the contamination and could tie the contamination to ASARCO prior to ASARCO entering bankruptcy in 2005. Like the cases discussed above, there are numerous facts here which show that the contamination took place before ASARCO entered bankruptcy and that Hammond and Whiting knew or at least should have known (unless their head was in the sand) that the contamination could be attributed to ASARCO.

Numerous statements and factual assertions in the Cities' own complaint illustrate they knew of a release of a hazardous substance, knew it would lead to response costs, and could tie the release to ASARCO well before the August 1, 2006 bankruptcy bar date. *See* DE 2050, *In re ASARCO LLC*, Cause No. 05-21207 (Bankr. S.D. Tex. Aug. 9, 2005). In their response brief, the Cities' state that they did not know of the contamination until 2016 because there were "no visible signs of contamination, no soil testing was performed, USEPA was not involved, and there were no publicized spills." [DE 24 at 15-16]. This argument is a little hard to swallow. The following facts listed in the Cities' complaint illustrate at least constructive knowledge of the contamination prior to 2006.

- o In Spring 1939, local residents reported that releases from the Facility were so harmful that the health issues they caused forced students to miss school [DE 1 at ¶ 16].
- o In April 1939, hundreds of residents complained to the Hammond City Council that discharges from the Facility damaged roofs of residences, caused coughing and sneezing, and made it virtually impossible to open doors or windows. [*Id.* at ¶ 17]
- o A health inspector for Hammond publicly testified regarding such alleged contamination activity on the "Whiting-Robertsdale community" as early as 1939 and a Whiting city councilperson publicly commented regarding the same in 1941 [*Id.* at ¶¶ 18-19].
- o A local church filed a complaint regarding such alleged contamination in the 1940s [*Id.* at ¶ 21].
- o A local newspaper published an article regarding such activity in the 1970s [*Id.* at ¶ 27].
- o A 1992 Consent Decree between Federated Metals and the EPA purportedly disclosed that while Federated Metals operated the facility, they generated hazardous waste in the form of dust, including hazardous lead waste and sludge from secondary smelting [*Id.* at 34].

Moreover, pursuant to the 1992 consent decree, a RCRA corrective action took place across the entire 36-acre smelter property. "The Corrective Action involved consolidating slag dredged from adjacent Lake George with contaminated soils excavated from facility production areas, and non-hazardous baghouse demolition debris into an existing on-site landfill on the property."[3] Surely, Hammond and Whiting knew, or should have known, all this activity related to Federated Metals' contamination was going on right in town for decades before ASARCO's bankruptcy bar date. The Cities cannot put on blinders and act as if they did not know they had an environmental claim related to this contamination before ASARCO entered bankruptcy. This would be, as described by the Seventh Circuit, an "ostrich defense." It's plain that the Cities could have raised an environmental claim prior to ASARCO's bankruptcy bar date but they didn't. Plaintiff's CERCLA claim should therefore be considered discharged by the court order confirming the bankruptcy. Plaintiff's Indiana ELA claim should be considered discharged for the same reason.

### C.  Was the RCRA Claim Discharged in the Texas Bankruptcy?

Let's turn now to Plaintiffs' RCRA claim. Claims brought under RCRA for injunctive relief are not considered claims which can be discharged in bankruptcy. The term "claim" is defined by the bankruptcy code as:

---

[3] United States Environmental Protection Agency, Federated Metals Corp Whiting Hammond, IN, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0501275 (last visited March 25, 2025).

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101 (5).

It is well established that only orders which can be turned into a right to payment are considered dischargeable "claims" for bankruptcy purposes. *See AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d 1342, 1348 (7th Cir. 1997) (collecting cases). The Seventh Circuit has made clear that a claim under RCRA is not a claim that can be reduced to a right to payment and discharged during bankruptcy. *See e.g., United States v. Apex Oil Co.*, 579 F.3d 734 (7th Cir. 2009); *AM Int'l, Inc.*, 106 F.3d at 1348. *See also, Meghrig v. KFC W., Inc.*, 516 U.S. 479 (1996) (explaining the RCRA does not allow a party to clean up a site and sue for response costs in lieu of seeking an injunction).

In *Apex*, the Seventh Circuit explained that RCRA does not entitle a plaintiff to demand, in lieu of action by the defendant, payment of clean-up costs, and it does not authorize any form of monetary relief. *Apex Oil Co.*, 579 F.3d at 736. In other words, under *Apex*, the cost of complying with an equitable decree is not a money claim that should be considered dischargeable. *Id.* at 737. As explained by the Seventh Circuit "[a]lmost every equitable decree imposes a cost on the defendant, whether the decree requires him to do something . . . or as is more common, to refrain from doing something." *Id.* In arriving at that conclusion, the Seventh Circuit distinguished *Ohio v.*

23

*Kovacs*, 469 U.S. 274 (1985). It is true, as noted in *Apex*, the Supreme Court "allowed the discharge in bankruptcy of an equitable obligation to clean up a contaminated site owned by the debtor." *Apex Oil Co.*, 579 F.3d at 737. But what made *Kovacs* different was the fact that when the debtor failed to comply, a receiver was appointed to take possession of the debtor's assets to sell in order to pay for the cleanup costs. In other words, the receiver was "seeking money rather than an order that the debtor clean up the contaminated site." *Id*.

The facts of *Kovacs* are very different from the facts before me (just as they were in *Apex*). Here, Hammond and Whiting have not already obtained an injunction; they're seeking one under RCRA. The Seventh Circuit succinctly summarized the state of the law regarding when a RCRA claim for equitable relief may be discharged writing:

> The sparsity of case law dealing with the discharge of claims . . . together with the near consensus of the cases . . . in which the issue has arisen, suggests a general understanding that discharge must indeed be limited to cases in which the claim gives rise to a right to payment because the equitable decree cannot be executed, rather than merely imposing a cost on the defendant, as virtually all equitable decrees do.

*Apex Oil Co.*, 579 F.3d at 738.

ASARCO argues the RCRA claim presently before me should be dismissed because it can be distinguished from cases in which the Seventh Circuit held that a RCRA claim cannot be discharged in bankruptcy. ASARCO attempts to distinguish this case from *AM Int'l* and *Apex* by arguing that "this case is not like Plaintiffs' cited authority, which assessed the effect of a discharge of pre-bankruptcy claims where

property was contaminated on a pre-bankruptcy and post-bankruptcy basis." [DE 25 at 10]. This argument incorrectly states the focus of the Seventh Circuit's analysis in deciding whether a RCRA claim is a claim which can be discharged in bankruptcy. The focus is not whether the site was contaminated pre-bankruptcy and post-bankruptcy but whether the request for injunctive relief under RCRA can be reduced to a right to payment such that it is a "claim" under the bankruptcy code.

In *AM Int'l*, the court mentioned that contamination occurred both pre- and post-bankruptcy in its discussion of the background facts of the case. While mentioned, it is not a central focus of the court's analysis related to the discharge of RCRA claims. Indeed, the quote provided by ASARCO in its reply brief is found in the opening section of the opinion well before the court begins its legal analysis. [*See* DE 25 at 10]; *AM Int'l, Inc.*, 106 F.3d at 1346. Again, the quote pulled from the *Apex* opinion is not central to the court's legal analysis and is a quote from the findings of fact section of the opinion. [*See* DE 25 at 10]; *United States v. Apex Oil Co.*, 2008 WL 2945402, at *1-2 (S.D. Ill. July 28, 2008). ASARCO's attempts to distinguish this case from controlling Seventh Circuit precedent fall flat. Plaintiffs' RCRA claim was not extinguished simply because it was not raised during ASARCO's bankruptcy proceedings.

### D. The RCRA Claim is Barred by the Consent Decree and Court Orders

But ASARCO gets better traction with its final argument—that even if the Cities' RCRA claim was not discharged during the bankruptcy, they are enjoined from bringing the claim by the bankruptcy consent decree and the court orders giving it

effect. I agree. As discussed above, ASARCO and the State of Indiana entered a consent decree which created a custodial trust through which ASARCO provided $1.2M to fund future environmental actions and future oversight costs of the governments in relation to the effected site. [DE 20-1 at 20]. It was agreed that the creation of the trust and the funds provided therein would be in "settlement and full satisfaction *of all claims* against Debtors related to the Designated Properties and the Sites." [*Id*. at 17] (emphasis added). The Amended Consent Decree was signed on March 2, 2009, by Indiana's Attorney General. [*Id*. at 62].

Although the Cities are not parties to the consent decree, they should be bound by the decree and the Texas orders confirming and approving the decree. The Cities are in privity with the State of Indiana because their interests related to the contamination originating from Whiting Site were adequately represented by the State during ASARCO's bankruptcy. "Privity is said to exist between parties who adequately represent the same legal interests." *Cavalier v. Speedway, LLC*, 2024 WL 1363413, at *4 (N.D. Ill. Mar. 29, 2024). *See also, Reps. Comm. for Freedom of the Press v. Rokita*, 2024 WL 4333137, at *6 (S.D. Ind. Sept. 27, 2024) ("Parties are in privity when there is a commonality of interest between the two entities' and when they sufficiently represent each other's interests."). Determining that privity exists between two parties is not an exact science and requires careful consideration of the circumstances of each case. *Cavalier*, 2024 WL 1363413, at *4. For a nonparty to be in privity with a party to an action, they must have such absolute identity of interests that the party to the earlier

26

action represented the same legal interest as the non-party to that first action. *Ayres v. Fin.*, 2018 WL 6606242, at *4 (W.D. Wis. Dec. 17, 2018). When two parties are in privity, the party whose interests were represented in the action should be bound by the judgment. *See Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 804 F. Supp. 2d 877, 884 (N.D. Ind. 2011); *Sec'y of Lab. v. Fitzsimmons*, 805 F.2d 682, 688 n.9 (7th Cir. 1986).

The interests of the Cities in this suit and the interests of the State of Indiana when it appeared as a creditor in ASARCO's bankruptcy proceedings are the same; to obtain payment for cleanup of the environmental contamination resulting from smelting activities at the Whiting Site. At the time ASARCO entered bankruptcy, the cascade of environmental claims facing the company created an extremely difficult situation for everyone involved. As explained in ASARCO's motion requesting the bankruptcy court's approval to settle environmental claims, ASARCO faced thousands of claims against their estates and responsibility for environmental contamination at hundreds of sites totaling approximately $6.5B in known damages and even more in unknown damages. *See* DE 10534*, In re ASARCO LLC*, Cause No. 05-21207 (Bankr. S.D. Tex. Aug. 9, 2005). Indiana, along with numerous other states, determined that the best course of action to ensure ASARCO contributed to cleaning up the large amount of contamination was to enter into a settlement agreement. This compromise and settlement took the form of the Consent Decree and Custodial Trust, signed by the Indiana Attorney General, which allocated $1.2M for clean-up efforts at the Whiting Site. Language from the Amended Consent Decree illustrates that Indiana's primary

goal during ASARCO's bankruptcy proceedings was to obtain funds to assist in the clean-up of the contamination originating from the Whiting Site. In the "Covenants Not to Sue" section of the Consent Decree, Indiana agrees to withdraw its claims for three other sites. "The State of Indiana withdraws its claims for the American Chemical Services Sites, Conservation Chemicals Site, and Four County Landfill Site . . . and agrees not to assert any further claims against Debtors or the Reorganized Debtors for such Sites." [DE 20-1 at 44]. This was all to ensure ASARCO contributed to efforts to clean-up the Whiting Site. Obtaining money to address contamination from the Whiting Site was the clear priority for Indiana. Under these circumstances, I simply cannot conclude that somehow Indiana did not adequately represent the Cities' interests in ASARCO's complicated bankruptcy proceedings.

Hammond and Whiting may believe that the $1.2M allocated to the Whiting Site by the consent decree and custodial trust is insufficient to address the contamination throughout their communities. In fact, recent statements by the EPA tend to say as much. In their letter regarding efforts to clean up the Whiting Site, the EPA states that the $1.2M from the ASARCO bankruptcy trust "performed groundwater studies and assessments and maintains the landfill cap" but was not sufficient to address contamination beyond the boundaries of the former Federated Metals facility. [DE 36-1 at 2]. However, the EPA signaled that it would take further action to address the contamination originating from the site. The EPA has added the Whiting Site to the National Priorities List and has released a schedule for its work at the site with a

28

remedial investigation/feasibility study scheduled for Dec 2024-Feb 2025. [DE 35 at 7].
The EPA lists the projected date to start remedial action as Jan-Mar 2026. [*Id*.] Perhaps
the Cities can look forward to additional assistance from the EPA, but they are barred
from pursuing further contributions from ASARCO.

Because the Cities are precluded from bringing their RCRA claim by the
bankruptcy consent decree and related court orders, I see no need to address the
parties' arguments regarding whether the RCRA claim should be considered statutorily
barred by 42 U.S.C. §6972(b)(2)(B).

In sum, the claims the Cities have presented in this suit should be dismissed with
prejudice as it would be pointless to amend the complaint. *Delisle v. McKendree Univ.*, 73
F.4th 523, 528 (7th Cir. 2023) (explaining that while plaintiffs are generally entitled to a
chance to amend their complaint, there is no entitlement to amend when an amendment
would be futile or otherwise unwarranted). The Cities failed to raise their CERCLA and
Indiana ELA claims prior to the confirmation of ASARCO's bankruptcy and are barred
from pursing those claims by the order confirming the bankruptcy. *See e.g.*, *In re
Morrow*, 495 B.R. 378, 389 (Bankr. N.D. Ill. 2013) (explaining that a creditor who fails to
raise a claim prior to the confirmation of a bankruptcy is barred from pursuing the
claim under principles of res judicata as the confirmation order is a final order); *Matter
of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 974 F.2d 775, 780 (7th Cir. 1992) ("[A]
creditor who fails to file a preconsummation claim before the applicable bar dates is
forever discharged from raising this claim against the debtor or its successors"). The

29

Cities' RCRA claim is barred by the Texas court orders giving effect to the consent decree as the Cities are in privity with Indiana regarding their environmental claims relating to the Whiting Site. *United States v. Willard Tablet Co.*, 141 F.2d 141, 143 (7th Cir. 1944) ("A judgment is res judicata in a second action upon the same claim between the same parties or those in privity with them."); *In re Pierce*, 563 B.R. 698, 703 (Bankr. C.D. Ill. 2017) ("Generally, res judicata is the doctrine of preclusion that applies to dismissals with prejudice pursuant to settlement agreements.").

**ACCORDINGLY:**

For the reasons explained in this Opinion and Order, Defendant ASARCO Master, Inc.'s Motion to Dismiss [DE 19] is **GRANTED.** Count I (Indiana ELA Claim), Count II (CERCLA Claim), and Count III of Plaintiffs' Complaint (RCRA Claim) are **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.

ENTERED: March 25, 2025.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT